Good morning, everybody. Just give us one second, Mr. Brandon, to turn the page. All right. So, Mr. Brandon, you have reserved no time for rebuttal. No, and I think I'm going to go under my 10 minutes as well, so I'm going to make up a little time for you. Good morning, everybody. When this brief was originally written approximately a year ago, the Supreme Court had recently decided Taylor. Taylor, I think the parties agree, has invalidated the 924C counts under count 9, 18, and 24. This brief was, however, written before this court decided McCoy. And I don't know what I can do about McCoy, because I don't think that you all have the authority to undo a prior panel's decision, which is on all fours with regard to a completed Hobbs Act robbery as the predicate for a 924C. I know that there's another case, certainly within this circuit, that's already been argued, the Barrett case, and we'll await decision on that. We'll await decision from the Supreme Court on completed Hobbs Act robbery at some point, and maybe Mr. Robinson will have further remedies with regard to any change in the law. Right now there was a wall against you. I hate to say that, but I believe that that's true, Judge. I mean, I probably presented my arguments for why completed Hobbs Act robbery is not a proper predicate differently than the people in McCoy, I assume. I didn't read the McCoy brief, so I couldn't have written the exact same thing, but I think I'm stopped. Right. In other words, you're not suggesting that we would get to look behind McCoy or to reach a different conclusion from McCoy just because you've thought up a hypothetical that wasn't presented in McCoy. I've never heard this one before. Give me your money or I'll blow my brains out. Correct. So the fact that McCoy came out the way it did, we will presume that McCoy considered all the hypotheticals and found that this is categorically a crime of violence. Well, thank you, Mr. Brandon. That's straightforward. Okay. I really, I think mostly I would like to talk for a bit about the fair trial point because it bothered me now that I do a fair amount of trial work as well. And Mr. Shore, who made an effort with regard to, I think, every important cooperating witness to talk to that witness, and two of them were accomplices, to talk to those witnesses about the benefit that they are going to get under cooperation agreements and the way they get that benefit is that in the first instance, the government has to make a motion. So that's true under 5K1. It's pursuant to a government motion. It's also true under 3553E. In order to get below any mandatory minimums that there may be, it has to be done on a government motion. I've seen this in so many different cases. This comes up all the time and I'm sure you have all seen it as well. I have never seen a situation where a judge said, oh, but there's an exception in the law that if the government decides that they're not going to file a 5K1 or a 3553E on behalf of a defendant and they do so with bad purpose or bad faith, then the defendant still might prevail and therefore it's really not on the government's motion. And the judge, therefore, on that basis alone, which is really, really, I mean, I'm not sure I've ever seen a successful application for that. Claiming that the U.S. government has somehow had bad faith in denying somebody their 5K1, especially after they've given substantial assistance. So the judge, in this instance, struck the testimony with regard to the first witness, told the jury that the defense attorney was arguing something that was a misstatement of the law and generally disparaged him, gave two separate cautionary instructions. And every time, the defense attorney was persistent and good and he went back to these arguments with regard to all four cooperating witnesses. Like I said, with regard to Leader and Winters, who were the main cooperators, who established for the government Mr. Robinson's M.O., who established arguably damaging, damning admissions that Mr. Robinson had made. But look, all the dirty laundry and bad acts of these folks was explored at length. It's really the district court preventing sort of consideration as to how their cooperation might benefit them short of a 5K that is really a problem here? Well, the case law from the circuit is that defense attorneys are permitted to pursue this line of questioning vigorously. And he didn't get to pursue it at all. What he wanted to get to was the point that in order for you, Mr. Witness, to get the benefit you're looking to get, you might actually say things that aren't true but are in keeping with the government's theory here. That's where he was headed. And that's what defense attorneys do all the time. And that's what he was precluded from doing. But, I mean, that point was argued in summation, right? I mean, that's really more of a logical argument than a factual one, right? Well, the point is it's the opposite of a vigorous pursuit of this line of questioning. Assuming that we would be sympathetic to your argument, Mr. Brandon, and I'm not saying we would be, but assuming that for a moment, how was your client prejudiced given the ability to argue in summation the need to stay on the good side of the government? Well, it's somewhat unclear what these witnesses would have said because they were never allowed to answer these questions. There's a phrase for me in the question that you wished could have been posed and was not permitted. Well, the first, I can give you the actual. Well, you just tell me the one. I mean, you know, the ideal, the platonic version of that question. The idea was do you realize, you the witness, do you realize that you can only get a below mandatory minimum sentence or a downward departure under 5K1 if the government in the first instance makes that motion for you? So you're really here to please the government, right? And if they don't understand that, that's another line of questioning for a defense attorney. Sometimes witnesses really don't know what's in their cooperation agreement. I'm sorry, Judge. One of these witnesses- What I was going to say was you, your predecessor, was prohibited from using the word only. That that was the only way it could happen because the judge thought there was this other way. Yes. So did counsel pursue the fact that, you know, the primary way it would happen or the way it usually happens or anything like that? Like the way it happens 99.99991% of the time? He did not. He felt precluded. But then what was he able to argue in summation about the relationship between the witness's testimony and the government moving for leniency for him? I think he generally argued, and I might not be completely factual about this. Maybe the government will remember better than I. But I think he generally made an argument that these were discredited witnesses, that they had prior drug convictions, prior other- But this all goes to the witness's intent or motive to lie, right? And so certainly there's nothing to prevent a cross-examination. It seemed to me it was basically covered that you hope you're going to get a 5K, and you hope that as a result of that you will get time served, right? And therefore, to get those things that you're hoping for, you need to curry favor with the government. There was nothing that prevented that line of questioning, right? No, but he did feel that the way he was struck down- I'm assuming that he felt the way he was initially struck down with regard to Winters led for him to not even ask really these cooperating witnesses the same line of questioning that he had with Winters. Because every time he tried to, the judge said, We're going back to this area I told you not to go to. We're going back to this area again. So I think that he risked being further disparaged in front of the jury, and he didn't want to lose credibility with them. That's really what I have to say here today. I think with regard to the sufficiency points, it's almost too difficult for me to address those orally. You really have to course through. This record is nearly 3,000 pages long, so I'll rely on my brief with regard to that. May I take a moment more of your time? You may. I'm looking at government appendix page 89. And it's not clear to me, but I was assuming this was the defense summation. Is that a correct assumption? I think that's correct, Judge. Okay, so if you look about two-thirds down the page, there's a paragraph starting to look at those cooperation agreements. And it ends with the sentence, It isn't hard to understand that to get the leniency that these witnesses are hoping for, they need the help and they need to satisfy the prosecution. Why wasn't that enough to basically give you the argument that you were trying to get with the question that, as I said, you weren't allowed to put in terms of only? Except for the fact that this is an argument of counsel. This is not evidence. So he didn't get the evidence from the witnesses directly. The jury's entitled to reject arguments of counsel. They're just suggestions. He's urging them to look at the cooperation agreements and saying it's implicit in there that the prosecution's good faith determination of truthfulness is what will dictate whether the motion is made. Okay, thank you. Thank you, Judge. Thank you, everybody. We'll now hear from the government. Mr. Bagnola? Bagnola. Bagnola. That's not the right way to say it. Judge Nardini has already admonished me on the way I say my name. All right, well, let's call yourself what you want. Mr. Bagnola. Exactly. All right, Mr. Bagnola, you may proceed. Thank you, Your Honor. May it please the court, my name is Anthony Bagnola. I am an assistant United States attorney in the Eastern District, and I was trial counsel below. I had planned today to explain to Your Honors why Hill and McCoy foreclosed the argument that a completed Hobbs Act robbery is not a crime of violence, but my friend Mr. Brandon seems to have conceded that question, so I'll spend my time today addressing the point that he emphasized, which is whether or not the trial court curtailed the cross-examination of cooperating witnesses to effectively a constitutional dimension. And I submit to Your Honors that the record makes clear she did not. Despite repeated admonishments, defense counsel at trial repeatedly misstated the law around 5K letters and his questions to cooperators, and the trial court had broad discretion to put reasonable limits on his questioning, and there cannot be an abuse of discretion where both parties, as they do here, agree that a disallowed question was based on a misstatement of law. Let me ask you, this limitation that the judge imposed was in response to a government's objection to the question? Yes, Your Honor. And because it's possible that if the government acted in bad faith, it might be ordered to make a 5K 1.1 motion? Correct. Do you know when that last happened in the Eastern District of New York? I don't, Your Honor, and I'll admit that it's infrequent, but the standard doesn't- Infrequent, ever? Has your office ever been found in bad faith not to have made a 5K 1.1 motion? I don't know if we ever have, but I would like to respond by pointing to page 86 of the government's brief, because I think that this idea of whether or not defense counsel was permitted to use the word only, or whether the word only was stricken, essentially, from his presentation, is inaccurate. Is it practical reality that maybe there would be a bad faith situation? Even more than that, Your Honor, he was permitted repeatedly to use the word only, and even though the question was originally, the objection was sustained with respect to Winters, as pointed out on page 86 of the brief, it says, Winters was flatly asked whether, quote, the only way that he can receive a sentence of less than five years is to receive a 5K 1 letter from the government, close quote, to which he answered, quote, yes. McHugh was asked whether his goal in signing the cooperation agreement was leniency, to which he answered, quote, yes. Cook was explicitly asked whether, quote, if he did certain things, he would get a letter from the government at the time of the sentence, to which he answered, yes, and et cetera, et cetera. I'll also direct the Court, as you've already pointed out in summations, this was not a defense lawyer, I submit, who was bashful about what he could and could not ask the jurors to infer about the cooperator's credibility. With respect to Winters' leader in Cook, he said they were, quote, liars and dealers and criminals, close quote, who, quote, received an agreement from the government in which they hoped to receive leniency, a lesser sentence for the crimes they committed. If the standard here, Your Honor, well, the standard being as it is, that, you know, the jury has to have been deprived of sufficient information to know and evaluate the cooperator's motives, there's no question on the current record that through opening statements, cross-examination that was not successfully objected to, and summations, there's no question the jury was able to know and understand the cooperator's motives for testifying a particular way, namely the hope for leniency at their own sentencing. Can you tell me what the status is now of the reasonable probability test in the wake of Taylor? Certainly, Your Honor, and Because that would be an issue as to whether we should, might be an issue as to whether we should raise a question as to whether something is needed in terms of a published opinion from us on this question. Certainly, Your Honor. I do think that the issuance of McCoy after Taylor reaffirming the governing principle from Hill obviates the need to revisit this question in a published opinion. I say we have to. Understood, Your Honor. As counsel pointed out, it's a pending issue in the Barrett case that's before the court already, isn't it? It is. There's at least two cases currently pending before the court in Barrett and Tysheen Rich. So should we wait for Barrett? Far be it from me to suggest what the court should do, but I certainly think that the question will be answered in Barrett. Do you know whether Barrett is going to address that question about reasonable probability? I expect it will, Your Honor. It was certainly argued in Mr. Barrett's motion, in his briefs, and the two hypothetical scenarios that Mr. Barrett raised are identical to the two hypothetical situations that Mr. Robinson has raised here, namely the possibility of invoking fear of injury to future non-tangible assets and the fear of harming oneself in a robbery of his or her own relative. Those two precise hypotheticals were presented in Barrett, and so I do think that the question presented here will be addressed in that case. To answer Your Honor's question more squarely, though, I do believe that the reasonable probability standard has survived. Taylor eliminated the need for the defendant to produce empirical evidence of charging habits on behalf of the government, but it certainly did not abrogate Hill's holding that something more than a theoretical possibility that a crime could be charged in a particular manner must be presented. The government had a stronger, different version originally, in which there was a question of whether there could be, you could actually have a, was it, was it, how was the statute used in reality? And if you did come up with a, I mean, if the statute was generally used in accordance with how one would expect it to be used, then that, you know, that, that was, that didn't help the defendant. I agree with you, Your Honor. I think that that core principle that there still must be something between a theoretical possibility and empirical evidence, you know, something more than that is still required to pass categorical muster. But how does, what does that look like? I don't understand. I mean, so if it's an elements-based test, how does a court just sort of figure out what's a theoretical possibility as opposed to something that is, you know, practical or possible? Well, I think that's where the holding from Hill still has viability, Your Honor. I think it still falls to the defendant in arguing, as Your Honor, you know, indicated earlier with the gun to his own head robbing his mother. I still think that after Taylor, there's a requirement for the defendant to come forward with some basis for the court to conclude that the Hobbs Act can be charged that way, not just in a defense lawyer's imagination, but in real life. Well, it can be charged that way. I mean, I mean, I guess what would prevent a prosecutor from doing that? Is it you're saying they would be prevented by just sort of good sense or discretion, or they'd be prevented by the fact that that's extortion, not robbery? The word can was inartful on my part, Your Honor. The standard that still governs after Hill is realistic probability. So not just whether they can, that would be a possibility, but rather whether it has been charged that way in the past, from which I think the court, or any court, can reasonably infer that this is something more than, you know, as Judge Raji, as you said in the Barrett argument, you referred to some of these hypotheticals as fanciful. The Supreme Court in Duenas-Alvarez said that it has to be more than the fanciful imagined application of a statute by a defense lawyer. But that's the question, how much more? And does it amount to showing that, in fact, the government has charged this lesser crime in fact? Or is there room for some sort of creative thinking in here? I think there's a gulf between creative thinking and what we've seen by way of hypotheticals in this and similar cases. Which are far-fetched. I would agree with that characterization, Your Honor. Right. A non-far-fetched creative thinking. I don't know if the court has to establish that standard in light of Hill and McCoy, but I do think that the realistic probability standard has survived Taylor, was reaffirmed in McCoy, and forecloses the defendant's argument here. Yeah. I guess it's really a question of how to establish the realistic probability. Go ahead, anyway. I'm just trying to figure out what's going to happen. But Merritt, hopefully, will shed some light on this. Yes, Your Honor. I would like to note in my limited time left that the evidence in this case was overwhelming with respect to the convictions in the seven Hobbs Act robberies and home invasions that were charged. The evidence was more than sufficient to sustain the jury's verdict. And so, I would respectfully urge the court to affirm Mr. Robinson's conviction and sentence in this case. And if you have no further questions, I'll rest on my briefs. All right. Thank you, Mr. Bagnolo. Mr. Brandon, thanks. We'll reserve decision.